IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MICKEY K. SUTTON,

       Petitioner,

v.                                     CASE NO. 1:07-cv-00064-MP-GRJ

JAMES MCDONOUGH, ET AL.,

       Respondent.

_____/

## REPORT AND RECOMMENDATION

     This case is before the Court on Doc. 1, Petitioner's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Petition stems from Petitioner's Alachua County convictions for burglary while armed, two counts of sexual battery by use of deadly force, kidnapping, and attempted first degree murder, for which he received consecutive sentences of life imprisonment. Petitioner contends that his constitutional rights were violated by the prosecution's failure to disclose evidence favorable to Petitioner and that his trial counsel rendered constitutionally ineffective assistance by (i) failing to investigate and prepare for trial because his counsel failed to follow-up on a previously filed motion to compel and (ii) failing to call a witness at trial. Doc. 1 and attached memorandum. Respondent has filed a response and appendix with relevant portions of the state-court record. Doc. 16. Petitioner has also filed a Reply to Respondent's response. Doc. 18. Upon due consideration of the Petition, the response, Petitioner's Reply to the Respondent's response, and the state-court record,

the undersigned recommends that the Petition be denied.[1]

## State-Court Proceedings

As set forth in the state-court record, the facts adduced at Petitioner's jury trial may be summarized as follows. *See* Respondent's Appendix ("App.") Exh. C (transcript of jury trial). The State charged Petitioner by second amended information with one count of armed burglary, two counts of sexual battery by use or threat of deadly weapon or by use of force likely to cause serious bodily injury, one count of kidnapping, one count of robbery with a weapon, and one count of attempted first degree murder.

Maria Gray testified at Petitioner's trial that she moved to Gainesville, Florida from South Africa and lived in the Gardens apartments with her husband Michael, whom she had met in Cape Town, South Africa. App. Exh. C. The evening that the crime occurred, her husband left their apartment to go to a friend's house in order to watch the Super Bowl while Ms. Gray remained at home to study for a test at the restaurant where she worked. That night it was raining very hard and windy. At the start of the fourth quarter of the Super Bowl, Ms. Gray heard a noise like a window screen being ripped off and then the sounds of the wind and rain were suddenly much louder. When she went to investigate the source of the noise, she saw that a bedroom window that she had closed earlier was now open. She walked to the window to close it and, when she stood up, she saw, out of the corner of her eye, a black man with a light-colored mask come out of the bedroom closet with a tire iron raised above his head. The man hit Ms. Gray over the head with the tire iron and blood filled her eyes,

---

[1] Because the Court may resolve the Petition on the basis of the record, the Court has determined that an evidentiary hearing is not warranted. *See* Rule 8, Rules Governing Habeas Corpus Petitions Under Section 2254.

blurring her vision.  The man then pinned her down on the bed, and Ms. Gray screamed and told the individual to take anything he wanted and leave.  The man then started to choke her, at which point Ms. Gray pulled his hair, which she said was coarse, "like a black gentleman's hair would be."  Exh. C. at 60.

Ms. Gray then bit the man's arm and then lost consciousness.  When she awoke, she was on the corner of the bed closest to the window.  She lost consciousness again and, when she awoke, the man was dragging her by her feet through the apartment's hallway.  At this point, Ms. Gray stated that her pants were halfway off, her assailant's zipper was down and he was attempting to force his penis into her vagina, but was unable to maintain an erection.   Her assailant then dragged her the rest of the way down the hallway and then removed her pants completely.  As the man then pulled his own pants down, Ms. Gray attempted to make a run for the front door, but she was dizzy and stumbled. Her assailant hit her over the head with the tire iron again.

The man then removed the rest of her clothes except for her bra and again placed his penis inside her vagina, at which point Ms. Gray again lost consciousness.  When Ms. Gray awoke, her assailant was gone, but shortly afterwards he re-entered the apartment and so she played dead.  She lost consciousness again, and when she awoke this time, the man was gone.  Ms. Gray then exited the apartment, clad only in her bra.  After knocking on the doors of several neighboring apartments and receiving no response, she stumbled through the apartment complex and attempted to stop the cars along Tower Road, the main road on which the apartment complex was located, but to no avail.  Eventually a female driver stopped, gave her a jacket and directed her

to a nearby convenience store, from which Ms. Gray called 911.

Ms. Gray testified at trial that she is 5'5" and that her assailant was not much taller than her. She also noted, however, that she was not very comfortable with the U.S. system of measurements since her home country, South Africa, utilizes the metric system. She restated on cross-examination that even though she first had told the police officers on the night of the crime that her attacker was 5'10" to 6', that she told the detective that her assailant was only a "little bit taller" than her. Exh. C. at 82.

Moments after Ms. Gray called 911, Deputy John Todd of the Alachua County Sheriff's Office ("ACSO") arrived at the convenience store in response to her call. He testified at the trial that he had received his dispatch between 9:00 and 9:30 p.m. and that he had arrived at the store within three to four minutes of his dispatch. When Deputy Todd arrived at the store, he found the victim wearing only a jacket and bra, and testified that she was drenched in blood from a laceration on her head. Paramedics arrived at the store soon after Deputy Todd and immediately began to treat Ms. Gray. Ms. Gray was then taken to Alachua General Hospital, with Deputy Todd following behind.

After the victim arrived at the hospital, Anita Griffis, a forensic nurse examiner, completed a sexual assault kit on the victim. She sealed it, placed the kit in an envelope, placed her identification stickers on the envelope, and then turned it over to Deputy Todd. Deputy Todd placed his chain of custody sticker on the kit, which he used to identify the kit at the trial. He took the kit with him, keeping it in his immediate possession until he arrived at the ACSO. When he arrived at the ACSO, he filled out a property sheet and then placed the kit in a locked refrigerator.

Dr. Adil Kabeer, M.D. examined the victim at the Alachua General Hospital and upon examination found that Ms. Gray had fractures to her nose and frontal sinus and a large laceration to her forehead, which was down to the bone and had produced a large flap of skin. According to Dr. Kabeer, the angle of the laceration meant that the victim had been hit by someone the same height as her because someone who was taller than her would have hit the victim on the head instead of the tangential blow across her nose at the angle of the eyebrow that was present when he examined her.

Deputy Richard Rooney of the ACSO reported that he was dispatched to the crime scene and arrived at the Grays' apartment at 10:06 p.m. He spoke to the neighbors, including taking of statement from Kevin Jones, who lived in a nearby apartment . Mr. Jones reported seeing a black male, approximately 5'10", wearing a yellow shirt who seemed a little distraught, leave the first apartment on Mr. Jones's right, look at Jones briefly and then turned and ran the other way.

Trial counsel deposed Kevin Jones prior to trial. Exh. L. Mr. Jones testified at his deposition that when he returned home to his apartment the night Ms. Gray was assaulted, as he was about to walk up the stairs to his apartment, he saw a black male about 5'10", with a medium build, walk out of the downstairs apartment on his right wearing a yellow shirt. The man had a roundish face and the hair on his head was short, "if he had any at all." Exh. L at 71. The man gave Mr. Jones a funny look for a brief second and then jogged away toward the parking lot. Mr. Jones did not see the man wearing gloves, a mask or carrying anything, and there were no stains on the man's shirt. Mr. Jones testified that he saw the person between 9:45 and 10:00 p.m and that the police approached him for a statement about half an hour later. Mr. Jones

stated that he did not believe he could identify the individual that he had seen and that he did not know the victim or her husband.

Marie Knowles, the ACSO evidence custodian, testified that at 8:40 am the morning after the assault she personally checked in the sexual assault kit from the refrigerator, where it had been placed by Deputy Todd the previous evening. Ms. Knowles then took the kit to the evidence room, checked it into the computer and then placed the kit in the locked evidence room refrigerator, to which only Ms. Knowles and her assistant had keys. On February 1, 2000, the kit was checked out of the evidence room by Karen Stabler for testing by the Florida Department of Law Enforcement ("FDLE") and was then checked back in on February 23, 2000.

Ms. Gray's sexual assault kit was received at the FDLE crime laboratory in Jacksonville, Florida on February 1, 2000 for testing. David George, a crime laboratory analyst in the Jacksonville lab, took custody of the kit on February 4, 2000 from the FDLE evidence vault, which is sealed and secured and to which only FDLE evidence technicians have access. When presented with what purported to be Ms. Gray's sexual assault kit at trial, Mr. George recognized the exhibit as the sexual assault kit that he had tested, as his markings appeared on it. He did not test the blood samples in the sexual assault kit, which consisted of two tubes of blood sealed in a clear plastic bag, but instead preserved the samples for further DNA testing. Mr. George next examined the vaginal smear slide microscopically, and found that spermatozoa were present. He then resealed the vaginal smear slide package, and returned it to the kit. He retained the swabs for further DNA testing and placed them into his evidence locker, which is in a secured location in the laboratory. He then resealed and returned

the original evidence to the FDLE evidence section for return to ACSO.

Lethenia Meadows, an analyst who worked in the serology section at the FDLE Jacksonville lab, also tested the evidence while it was at the Jacksonville lab. Ms. Meadows, who was called by the defense at trial, testified that she had received the evidence from Deanne Johnson, another analyst at the Jacksonville lab who was unable to obtain results from the sample. Ms. Meadows testified at trial that she performed a polymerase chain reaction on the sample, and after reviewing her notes, testified that when she had completed her testing she placed the evidence into the freezer. Ms. Meadows also admitted, however, that she had said during her deposition prior to trial that she did not recall what she had done with the samples when she had finished testing them. She explained, however, that after having had the opportunity to review her notes that she now knew what she had done with the evidence, which is that she had placed it back in the freezer.

The tests performed by Ms. Meadows were not actually utilized in this case. Instead, Vivienne Armstrong, an FDLE crime laboratory analyst specializing in serology and DNA in the FDLE's Orlando laboratory, in May 2002 performed the DNA testing on the evidence in this case that was ultimately presented at trial. Ms. Armstrong first obtained Maria Gray's DNA profile by testing a sample of Ms. Gray's blood. At the D3S locus, she determined that Ms. Gray was an 18, because one very large peak appeared, meaning that Ms. Gray was a homozygote. Ms. Armstrong explained that a heterozygote receives different alleles from the mother and father and that, when this happens, the smaller of the two peak heights for the alleles is within eighty percent of the larger peak height. For instance, at the locus where Ms. Gray is 28, 31, the

measurement in relative fluorescent units ("RFUs") is 2048 for the larger peak and 1822 for the smaller peak. This means the smaller peak size is within eighty percent of the taller peak height. Ms. Armstrong noted that the peak height ratios for an individual are fairly close to each other, meaning within sixty percent of each other, and that a peak height ratio under sixty percent between two peaks indicates the presence of a mixture of DNA in a sample.

Ms. Armstrong performed a DNA analysis on the tire iron found near the scene of the assault and the gray jacket that Ms. Gray wore after the assault, and found that the DNA from the blood on both matched Ms. Gray's DNA profile. When asked at trial how likely it was that the blood on both came from the victim Ms. Armstrong stated that it was virtually certain. Ms. Armstrong also later performed a DNA analysis on a buccal swab taken from Petitioner and determined that the Petitioner's profile at the D3S allele was 16, 17.

Ms. Armstrong also tested the vaginal swabs from Ms. Gray's sexual assault kit. She obtained a clean separation of the sperm cell fraction, and noted that "the vaginal swabs in the sperm cell fraction was a match with Mickey Sutton all the way down and it was clean." *Id.*

Ms. Armstrong next tested the epithelial cell fraction from the vaginal swabs in the sexual assault kit and found that, in addition to Ms. Gray's DNA, there was also a very little of someone else's DNA "that could be from Mickey Sutton," which she testified "isn't unusual" and "happens all the time." Ex. C. at 397. During her trial testimony, Ms. Armstrong described for the jury what led her to conclude that there was additional DNA present at the epithelial cell faction and that it was Petitioner's

DNA.  In testing the epithelial fraction at that particular allele, she discovered that 18, 18 was the major profile and had produced a peak 4,300 RFUs in height.

Ms. Armstrong also discovered while testing the epithelial cell fraction that there was a 17 peak on the D3S allele that came in above the normal size of a stutter peak. Stutter occurs as a by-product of DNA testing and can sometimes be responsible for the presence of peaks on a DNA test.  This 17 peak at the D3S allele measured 663 RFUs, which Ms. Armstrong testified was over the ten percent threshold that would identify the peak as stutter at this particular allele.  Petitioner's counsel asked Ms. Armstrong on cross-examination whether the 17 peak at the D3S allele could be attributed solely to stutter. Ms. Armstrong replied that a stutter peak this high at that particular allele has never been recorded.  She stated that it was more likely stutter in combination with the fact that there was also someone else's DNA present.  Her final conclusion was that "[t]here's no way that these two peaks, the 17 and the 18, could go together for one individual because the difference in peak heights was so great."  Exh. C. at 399.

In Ms. Armstrong's opinion, the major profile from the vaginal swab epithelial cells taken from Ms. Gray's sexual assault kit matched Maria Gray in vaginal epithelial separation, while the semen matched Petitioner.  When asked if there was any chance that the epithelial portion of the DNA in this case was not the victim's, Ms. Armstrong responded: "Absolutely not. You know, based on the DNA results and the very major profile the epithelial cell fraction gave, based on the chain of custody, there's no doubt in my mind that these vaginal swabs came from Maria Gray."  Exh. C. at 406.  Ms. Armstrong also noted that it was standard protocol in her laboratory to utilize both a

second reader and a technical reviewer to verify the results before a report was sent out, a procedure that was followed in this case.

Dr. Martin Tracy, a genetics professor at Florida International University who specializes in population genetics, analyzed Ms. Armstrong's data and results from the tests that she performed in connection with this case. He testified at trial and confirmed the accuracy of her results, noting that the chances of selecting another unrelated individual with the same profile as that found in the sexual assault kit were one in 14 quadrillion. This led Dr. Tracy to conclude that the semen found inside the victim was indeed the Petitioner's semen and that his chances of being wrong in that conclusion were one in 14 quadrillion. Dr. Tracy also concluded that the epithelial DNA from the vaginal swabs matched Maria Gray's DNA profile.

The defense called its own DNA expert witness, Dr. William Hauswirth, a professor of molecular genetics and ophthalmology at the University of Florida College of Medicine. Dr. Hauswirth stated that his conclusion was that the female DNA in this case did not match Ms. Gray or else that the data was inconclusive as to whose DNA the female DNA was. Dr. Hauswirth testified that the 17 peak at the D3S allele could not be stutter under FDLE's own definition, because it was more than six times the minimum required under FDLE's own requirements to consider the source of the peak as stutter. Dr. Hauswirth admitted that it was possible that the 17 peak could have been caused by male cell contamination, but explained that the contamination should have appeared at all of the other loci if that type of contamination had occurred, and that none of the other 12 loci showed any signs of contamination. Accordingly, Dr. Hauswirth stated that the only two possibilities to explain the 17 peak at the D3S allele

were that the DNA did not belong to Maria Gray or that the DNA testing was inconclusive. He also agreed on cross-examination that the Petitioner's DNA had never been at the Jacksonville laboratory and that all testing relevant to this case had been performed at the FDLE's Orlando laboratory.

The jury found the Petitioner guilty as charged to Counts I through IV and Count VI, but not guilty of Count V, robbery with a weapon. The trial court sentenced the Petitioner to life imprisonment on Count I consecutive to the sentence in Count II, life on Count II, life on Count III concurrent with the sentence in Count II, life on Count IV to be served consecutive to Counts I and II, and life on Count VI consecutive to the sentences on Counts I, II and IV. The trial court ordered each sentence be served consecutive to any sentence that the Petitioner was currently serving.

On April 28, 2004, the Petitioner filed his first motion for postconviction relief. Exh. J. In his motion, Petitioner alleged that his conviction was obtained "by unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant." Exh. B at 292, Exh. J at 292. The Petitioner was referring to documents and information regarding the workplace performance of Lethenia Meadows, the FDLE analyst who performed some of the tests on the victim's sexual assault kit that were ultimately never used by the prosecution at Petitioner's trial.

Petitioner filed a Notice of Voluntary Dismissal on August 10, 2005 voluntarily dismissing his first motion for postconviction relief. Exh. K. On May 3, 2004, Petitioner filed his Notice of Appeal. On March 2, 2005, the First District Court of Appeal issued a per curiam affirmance of Petitioner's conviction. Exh. H. On March 18, 2005, the First District Court of Appeal issued its mandate on Petitioner's direct appeal. Exh. I.

Petitioner filed a second Motion For Postconviction Relief with the state trial court on February 17, 2006. Exh. L. Petitioner alleged that his conviction was obtained due to the unconstitutional failure of the prosecution to disclose *Brady* material to the Petitioner and that trial counsel was ineffective in (i) failing to investigate and prepare for trial in not pursuing possible impeachment evidence of defense witness Lethenia Meadows, (ii) failing to call a disinterested witness, Kevin Jones, (iii) failing to object and/or properly cross-examine an expert witness, (iv) failing to object to the admissibility of DNA evidence, and (v) improperly objecting to testimony by a prosecution witness. Petitioner's motion was denied by the state trial court on May 3, 2006 and Plaintiff then appealed to the First District Court of Appeals. The First District Court of Appeals issued a per curiam affirmance of the denial on December 7, 2006 and issued its mandate on January 4, 2007. Exhs. O & P. Petitioner then filed the instant Petition, which Respondent concedes is timely.

## Section 2254 Exhaustion Requirement

Before bringing a habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion. 28 U.S.C. § 2254(b)(1), (c). Exhaustion requires that prisoners give the state courts a "full and fair opportunity" to resolve all federal constitutional claims by "invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To properly exhaust a federal claim, a petitioner must "fairly present" the claim in each appropriate state court, thereby affording the state courts a meaningful opportunity to "pass upon and correct alleged violations of its prisoners' federal rights."

*Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation omitted).

When a petitioner fails to properly exhaust a federal claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred under state law, the claim is procedurally defaulted. *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999). Federal habeas courts are precluded from reviewing the merits of procedurally defaulted claims unless the petitioner can show either (1) cause for the failure to properly present the claim and actual prejudice from the default, or (2) that a fundamental miscarriage of justice would result if the claim were not considered. *Id*. at 1302, 1306. A fundamental miscarriage of justice exists "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010). To state a credible claim of actual innocence, a petitioner must present new reliable evidence that was not presented at trial showing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## Section 2254 Standard of Review

For properly exhausted claims, there are limitations on this court's review of state court findings of fact. Under 28 U.S.C. § 2254(d)(2), a federal court may not grant a state prisoner's application for a writ of habeas corpus based on a claim already adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be

correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings. *Hawkins v. Alabama,* 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted) ("The decisions of other federal circuit courts (and our decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts (and by implication would compel a state court) to decide in a definite way the case before them."). *See also, Carey v. Musladin,* 549 U.S. 70, 74-77 (2006) (§ 2254 refers to holdings, rather than *dicta,* of the Supreme Court, collecting circuit cases "[r]eflecting the lack of guidance from this Court," on the issue).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *Williams v. Taylor,* 529 U.S. 362, 404-406 (2000); *Bell v. Cone,* 535 U.S. 685, 694 (2002) (citing *Williams* ). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams,* 529 U.S. at 412-13. "Avoiding these pitfalls [described in *Williams v. Taylor* ] does not require citation of our cases-indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8 (2002) (emphasis in original). Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." *Holland v. Jackson,* 542 U.S. 649, 652 (2004).

## Ineffective Assistance of Counsel

Because Petitioner's second and third claims raise the issue of counsel's effectiveness, a review of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.   To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.  *Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.  The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice.  *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide

factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted). This standard is objective, and "it matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight." *Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007). "The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel." *Id*. When the court "can conceive of a reasonable motivation for counsel's actions," it can deny the claim of ineffectiveness without an evidentiary hearing. *Id*. "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption . . . that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold

a lawyer's strategy, [the Court] need not attempt to divine the lawyer's mental

processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can

be expected to have considered all of the ways [to provide effective assistance]." *Id*.

> If a defense lawyer pursued course A, it is immaterial that some other
> reasonable courses of defense (that the lawyer did not think of at all)
> existed and that the lawyer's pursuit of course A was not a deliberate
> choice between course A, course B, and so on. The lawyer's strategy
> was course A. And [the Court's] inquiry is limited to whether this
> strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's

unreasonable conduct might have had "some conceivable effect on the outcome of the

proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a

"reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id*. at 694. A "reasonable probability is

defined as a probability sufficient to undermine confidence in the outcome." *Id*. Where

a defendant challenges a not-guilty plea based on ineffective assistance of counsel, he

must "show that there is a reasonable probability that, but for counsel's errors, he

would have pleaded guilty and would not have insisted on going to trial." *Coulter v.

Herring*, 60 F.3rd 1499, 1504 (11th Cir. 1995) (internal quotations omitted).

Finally, the Eleventh Circuit has recognized that given the principles and

presumptions set forth above, "the cases in which habeas petitioners can properly

prevail . . . are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).

This is because the test is not what the best lawyers would have done or even what

most good lawyers would have done, but rather whether a reasonable lawyer could

have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221

F.3d 1177, 1180 (11th Cir. 2000).

## **Petitioner's Claims**

Petitioner asserts three grounds for postconviction relief in his Petition.

Respondent concedes that the Petition was timely filed and that Petitioner exhausted

his state court remedy for each of the three grounds raised in the Petition. The Court

will address each ground in turn.

### **(1)    State's Failure to Turn Over *Brady* Material**

Petitioner's first ground for postconviction relief is that the prosecution failed to

turn over materials favorable to him in violation of its duty under *Brady v. Maryland*.

The "suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963). Evidence is "material" under *Brady* "only if there is

a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different." *United States v. Bagley*, 473 U.S.

667, 682 (1985). In turn, a "'reasonable probability' is a probability sufficient to

undermine confidence in the outcome." *Id*. These are the same standards as those

lying at the heart of *Strickland*. *Id*.

On July 16, 2003, prior to trial, Petitioner's counsel moved to compel discovery

of, among other things:

> 5. Legible copies of the following documentation relating to
> all persons involved in testing or reviewing the DNA testing
> performed in this case:

a. Curriculum vitae
b. Job description
c. Documentation relating to training of the individual
d. Job performance assessments/evaluations/reviews
e. Proficiency tests
f. Disciplinary reports or actions
g. Documentation relating to methods of storage of the evidence subjected to DNA testing in this case.

Exh. L. at 22-23.  On September 25, 2003, a hearing on Petitioner's motion to compel was held and the state trial court entered an order granting the Petitioner's motion to compel, an order which reproduced item (5) above verbatim.  Exh. Q.

Petitioner contends that, despite the trial court's order granting his motion to compel, that the state never supplied certain discovery to the defense prior to trial. Petitioner was contacted by his counsel after the time for filing a motion for a new trial in this case had expired.  Petitioner's counsel informed Petitioner that counsel had received two documents from Deputy Public Defender John Kearns regarding the workplace performance of defense witness Lethenia Meadows.

The first document consisted of the report of an oral board examination that had been conducted due to Ms. Meadows's mixing up of samples in another case.  Exh. B. The examining panel noted gaps in Meadows's knowledge of DNA transcription and translation, and weak understanding of the Hardy-Weinberg principle and the meaning of population substructuring.  Despite these weaknesses, however, the panelists concluded that Meadows's grasp of DNA structure and the replication function as well as the principles of the polymerase chain reaction process was acceptable.  Exh. B. at 310.  The board's final conclusion was that, although "there were some gaps in SCLA Meadows [sic] performance during the oral board, there were none that could not be

addressed with some specific review and refresher training." *Id.* at 310-11.

The second document consisted of a March 1, 2001 memorandum from FDLE Chief Forensic Scientist Suzanne H. Livingston to FDLE Deputy Commissioner Dennis A. Williamson describing the results of a quality assurance committee that had been convened to review quality issues related to Meadows. Exh. B. Ms. Livingston noted that a review of twelve months' worth of Meadows's work had revealed that "numerous errors of both an administrative and technical nature were found in over two-thirds of those files reviewed" and that "[s]ome of the technical errors resulted in incorrect results being reported." Exh. B. at. 312. Review of Ms. Meadows's testimony from several sworn depositions reflected "factual errors regarding serological and DNA testing, a general lack of clarity and overall indecisiveness regarding issues and areas with which she should be intimately familiar given her experience in the field." *Id.* at 313. Ms. Livingston recommended that Ms. Meadows no longer be allowed to function as a Crime Laboratory Analyst with FDLE because, "[d]ue to the nature of the errors and their frequency, it is doubtful that she could be retrained and rehabilitated to the point where she could again be a viable expert witness." *Id.*

Petitioner argues that the prosecution's failure to turn over this evidence constituted a *Brady* violation on the state's part, a ground that he also raised in his state motion for postconviction relief. The state court correctly applied *Brady* and concluded that the Petitioner failed to show a reasonable probability that the outcome of his trial would have been any different had this evidence been disclosed to him for three reasons. First, the state court noted that the prosecution had established the entire chain of custody of the crime scene sample that was tested for DNA purposes, a

chain of custody which did not include Ms. Meadows. The state trial court noted that each person in that chain had testified as to his/her receipt of the sample, the condition of the sample upon receipt and what tests he/she had performed upon the sample. Second, the defense expert, Dr. Hauswirth, did not take issue with the DNA testing that was performed at the FDLE Orlando lab, which was the DNA evidence presented at Petitioner's trial. Lastly, the state court noted that the evidence regarding Ms. Meadows's workplace performance also would not undermine the DNA testing that was performed in this case. The DNA results in this case were not the product of Ms. Meadows's interpretation, but were instead based upon testing and analysis that were performed in the FDLE Orlando laboratory by Vivienne Armstrong, not the Jacksonville laboratory where Ms. Meadows was employed.

Furthermore, Plaintiff was not prejudiced by the late discovery of this information. As the state court noted, Plaintiff was able to pursue a theory that the DNA samples had been mixed up in this case even without the alleged *Brady* material that Petitioner's counsel later obtained and turned over to Petitioner. The state judge noted that the Petitioner's counsel had impeached Ms. Meadows during her trial testimony with her prior inconsistent statement from her deposition that she did not recall what she had done with the DNA sample after she had finished her testing of it. In addition, the state court judge also noted that Dr. Hauswirth, Petitioner's expert witness, had called into question whether the DNA sample actually matched the victim in this case, Ms. Gray.

As the trial court also noted, the prosecution established the entire chain of custody at Petitioner's trial and, notably, Ms. Meadows was not a part of that chain of

custody. The fact that Ms. Meadows had mixed up samples of DNA from different cases in the past would not undermine confidence in the jury's verdict in a situation in which she was not the one performing the testing or interpreting the results of the DNA tests. As the state court pointed out, the DNA tests that eventually linked the Petitioner to the crime were not performed by Ms. Meadows. There is no evidence that the particular swabs from the crime scene that were tested in Orlando were handled by Ms. Meadows in Jacksonville.

In addition, this alleged *Brady* evidence is also not nearly as negative towards Ms. Meadows as the Petitioner makes it out to be. The February 9, 2001 memorandum describing her performance on the oral board examination that was administered to her in the wake of the discovery of her errors in another case reflected that her general DNA knowledge was adequate as well as that, although there were gaps in some areas of her knowledge, that none of these gaps "could not be addressed with some specific review and refresher training." Exh. B. at 310-11. Although the March 1, 2001 memorandum did reflect a recommendation that she no longer be employed as a crime laboratory analyst with FDLE, Ms. Meadows testified at trial that she was still employed by FDLE at the Jacksonville lab as a forensic technologist in the evidence section.

The Court therefore concludes that there is not a reasonable probability that had the evidence regarding Ms. Meadows's workplace performance been disclosed to the defense earlier the result of Petitioner's trial would have been different. Plaintiff was able to impeach Meadows without this evidence, the tests that she performed were not used as evidence at Petitioner's trial and Meadows was not a part of the

chain of custody of the crime scene sample in this case.  Accordingly, the state court's resolution of Plaintiff's *Brady* claim was not contrary to or an unreasonable application of federal law as established by the Supreme Court and also did not involve an unreasonable determination of the facts as presented at Petitioner's trial.

### (2)    Ineffective Assistance Claims

Petitioner also raises two ineffective assistance claims in his petition, each of which the Court now will address in turn.

### A.    Failure to Follow-Up on Motion To Compel

Petitioner's first claim of ineffective assistance is closely related to his *Brady* claim regarding the documents that relate to Ms. Meadows's workplace performance. Petitioner contends that his counsel was ineffective in failing to investigate other means – such as through a public records request or under a court order – for obtaining the information contained in the documents which were not disclosed. According to Petitioner,  his counsel was ineffective for failing to follow up after Petitioner's motion to compel was granted. Petitioner suggests that his counsel should have questioned the state or presented argument to the trial court regarding why and how the state failed to comply with the court's order granting Petitioner's motion to compel.  Petitioner characterizes counsel's conduct as having "abandoned" the issue.

The state trial court considered this claim on postconviction review and properly applied *Strickland.* The state court rejected Petitioner's claim that his counsel was ineffective for failing to obtain the documents regarding Ms. Meadows's workplace performance issues.  The state court found that Petitioner was "seeking to have it both ways" by first arguing that the defense could not have obtained this evidence through

the use of due diligence in his *Brady* claim and then also arguing that his counsel was

ineffective in failing to discover evidence that Petitioner's counsel allegedly could and

should have discovered through due diligence. The state court concluded that

Petitioner's ineffective assistance claim for failure to investigate failed because

Petitioner did not sufficiently demonstrate prejudice, which was the same reason

Petitioner's related *Brady* claim failed. The state judge properly noted that Petitioner's

counsel had impeached Meadows with her prior inconsistent deposition statement as

well as argued that the DNA samples in this case were unreliable because Meadows

could have mixed up the samples with the samples from another case, as she had

done in the past. The state court's conclusion was more than reasonable. Petitioner

was still able to put on his theory that Ms. Meadows had mixed up samples in this case

and was able to present the testimony of Dr. Hauswirth's that the DNA samples in this

case did not contain Ms. Gray's DNA. Accordingly, Plaintiff suffered no prejudice

under *Strickland* as a result of his failure to receive the two documents regarding Ms.

Meadows's workplace performance and, accordingly, his counsel was not

constitutionally ineffective.

Petitioner also failed to demonstrate that his counsel's performance was

deficient. There is no evidence in the record that Petitioner's counsel was anything

less than diligent with respect to these two documents relating to Ms. Meadows.

Petitioner's counsel filed a pre-trial motion to compel, which was granted by the trial

court. As the state court addressing this issue in Petitioner's second motion for

postconviction relief noted, defense counsel could reasonably have relied upon that

order as having disposed of the issue. The state was under an obligation to disclose

the evidence, and it appears from the record that Petitioner's counsel did not even become aware of its existence until it was furnished to him by Deputy Public Defender John Kearns. Counsel also contacted Petitioner after receiving the documents and provided them to Petitioner. Accordingly, Plaintiff's claim that his counsel rendered ineffective assistance in failing to investigate was not an unreasonable application of or contrary to *Strickland*.

### B. <u>Ineffective Assistance Regarding Uncalled Witness</u>

Petitioner also alleges ineffective assistance because his counsel failed to call Kevin Jones as a witness at trial. "Complaints concerning uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative." *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980). In this case, there is not any speculation as to what Mr. Jones would have said if he was called to testify at trial – he testified in his deposition that he saw a black male leaving the victim's apartment not long after Ms. Gray was repeatedly assaulted.

The state court properly applied *Strickland* to determine that defense counsel's performance was neither deficient nor was Petitioner prejudiced by counsel's failure to call Mr. Jones. The state court noted that Mr. Jones's testimony that Ms. Gray's assailant was 5'10" would be, if anything, cumulative because a number of other witnesses testified that the victim initially had reported that her assailant was between 5'10" and 6'0". The state court also noted that Mr. Jones only reported seeing the individual for a few seconds before the individual jogged away towards the parking lot, and that Mr. Jones reported he would not have been able to identify the individual that

he had seen that evening again.

In light of the trial record, the Court cannot say that the state court's rejection of Petitioner's ineffective-assistance claim was contrary to, or an unreasonable application of *Strickland*. Petitioner's counsel deposed Jones prior to trial. Detective Todd testified that the victim herself had told him shortly after the attack that her assailant was between 5'10" and 6'. Ms. Gray testified, however, at trial that this report was mistaken because of her unfamiliarity with the U.S. system of measurement and that her assailant was really the same height as her. There was also other evidence to that Ms. Gray's assailant was the same height as her--5'5"-- i.e. the testimony of Dr. Adil Kabeer that the laceration on the victim's forehead indicated that Ms. Gray's assailant was roughly the same height as her. The jury in convicting Petitioner, who stands only 5'5", apparently did not accept the victim's own statements in the immediate aftermath of the attack that her assailant was between 5 and 7 inches taller than her. Thus, Mr. Jones' testimony would not have made any difference in the outcome of Petitioner's trial. Accordingly, Petitioner's ineffective assistance claim based upon the failure to call Mr. Jones as a witness was not contrary to or an unreasonable application of *Strickland*.

## Recommendation

Accordingly, for the foregoing reasons it is respectfully **RECOMMENDED** that the petition for a writ of habeas corpus, Doc. 1, be **DENIED,** and that a certificate of

appealability be **DENIED**.

        **IN CHAMBERS**  this 11ᵗʰ day of March, 2011.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

        **A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**